# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SHARON LOUISE MOORE,** | ) | |
| **Plaintiff** | ) | Civil Action No. 2:19cv00006 |
| | ) | |
| **v.** | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **ANDREW SAUL,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| **Defendant** | ) | United States Magistrate Judge |
| | ) | |

*I. Background and Standard of Review*

Plaintiff, Sharon Louise Moore, ("Moore"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Neither party has requested oral argument. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Moore protectively filed her application for DIB on March 9, 2015, alleging disability as of March 20, 2015, due to depression; anxiety; osteoarthritis; hearing loss in the left ear; short-term memory loss; edema in the feet, ankles, knees and hands; vascular problems in the legs; dry eyes; problems with the knees and shoulders; lower back pain; and fibromyalgia. (R. at 310-11, 336, 362.) The claims were denied initially and upon reconsideration. (R. at 255-57, 260, 262-64.) Moore then requested a hearing before an administrative law judge, ("ALJ"). (R. at 265-66.) The ALJ held a hearing on October 26, 2017, at which Moore was not represented by counsel. (R. at 201-28.)

By decision dated March 30, 2018, the ALJ denied Moore's claim. (R. at 11-22.) The ALJ found Moore meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2020. (R. at 13.) The ALJ found Moore had not engaged in substantial gainful activity from March 20, 2015, through the date of the decision.[2] (R. at 13.) The ALJ found the medical evidence established Moore had severe impairments, namely degenerative disc disease; degenerative joint disease; and fibromyalgia, but he found Moore did not have an impairment or

---

[2] In order to be eligible for DIB benefits, Moore must show she was disabled between March 20, 2015, and March 30, 2018.

combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13, 15.) The ALJ found Moore had the residual functional capacity to perform sedentary work[3] that did not require more than occasional pushing/pulling with the upper extremities, use of hand controls, reaching overhead with both hands, climbing ramps and stairs, balancing, stooping, kneeling and crouching; and that required no crawling, climbing ladders, ropes or scaffolds or working at unprotected heights or around moving mechanical parts. (R. at 16.) Based on Moore's age, education, work history and residual functional capacity, and the testimony of a vocational expert, the ALJ found Moore was able to perform her past relevant work as an eligibility worker and eligibility supervisor. (R. at 21.) Thus, the ALJ concluded Moore was not under a disability as defined by the Act through the date of the decision and was not eligible for DIB benefits. (R. at 22.) *See* 20 C.F.R. § 404.1520(f) (2019).

After the ALJ issued his decision, Moore pursued her administrative appeals, (R. at 308), but the Appeals Council denied her request for review. (R. at 1-6.) Moore then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before this court on Moore's motion for summary judgment filed June 24, 2019, and on the Commissioner's motion for summary judgment filed July 23, 2019.

---

[3] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2019).

## II. Facts

Moore was born in 1959, (R. at 310), which, at the time of the ALJ's decision, classified her as a "person of advanced age" under 20 C.F.R. § 404.1563(e). Moore has a high school education and past work experience as an eligibility worker and a claim supervisor. (R. at 206, 222.) At the outset of the hearing, the ALJ explained to Moore her right to have an attorney or nonattorney representative assist her with her claim. (R. at 203-04.) Moore affirmed her understanding and chose to proceed unrepresented. (R. at 204.) Moore testified she stopped working as a benefits eligibility supervisor just prior to a shoulder surgery on March 20, 2015. (R. at 206-08.) She testified she spent six to seven hours sitting at her desk. (R. at 208.) She stated if she had not stopped working, she would have had a mental breakdown due to job stressors, including long work hours and understaffing issues. (R. at 211.) Moore testified she tried to get her 30 years in so she could receive full retirement benefits, but she left at 28 and one-half years. (R. at 212.) She stated she applied for Virginia Retirement System disability benefits and was found disabled based on both physical and mental grounds. (R. at 212-13.)

Moore testified she suffered from severe varicose veins which caused her legs to swell, and her doctors believed she had a blood clot. (R. at 213.) She testified she had these veins stripped in one leg but had not returned to have the other leg done. (R. at 214-15.) Moore testified she had arthritis from the "back of [her] neck … to [the] end of [her] toes," aggravated by cold or "bad" weather. (R. at 220.) She stated she was scheduled to have injections in her back later that month, and if they did not work, she was facing surgery. (R. at 214.) Moore testified she also had degenerative disc disease in her neck, arthritis in her shoulders and hands, hip pain and

fibromyalgia, which was confirmed by a tender point examination, and for which she had taken Lyrica. (R. at 215-16.)

Moore testified she previously had seen a counselor two to three times weekly but could no longer afford it. (R. at 213.) She stated she currently was seeing Ava Martin monthly but had not done so for the previous few months for financial reasons. (R. at 216-17.) However, Moore stated her primary doctor helped manage her mental health complaints. (R. at 216.) She testified her memory had gotten "terrible." (R. at 213.) Moore testified she had been taking Cymbalta for six to seven years and BuSpar for a couple of years for her mental health symptoms. (R. at 218-19.) She noted she was taking Cymbalta when she was working and "could [not] have made it" without it. (R. at 219.) The ALJ advised Moore he did not have any treatment records from Martin, despite Moore's statement she had requested they be sent. (R. at 217.) The ALJ advised Moore he would request those records and leave the record open until their receipt. (R. at 218, 228.) When asked, Moore testified she was not aware of any other evidence relating to her disability that she had not gotten to the ALJ. (R. at 227.) She did advise him of some upcoming procedures. (R. at 227.)

Barry Hensley, a vocational expert, also testified at Moore's hearing. (R. at 220-27.) Hensley classified Moore's work as an eligibility worker for federal government programs and as a claim supervisor as skilled and sedentary work. (R. at 222.) Hensley testified there would be no competitive employment for a hypothetical individual expected to be off task 15 percent of an eight-hour workday in addition to normal breaks or for a hypothetical individual who would be absent from work more than twice monthly. (R. at 222.) Hensley testified a hypothetical

individual of Moore's age, education and work history, who could perform light[4] work that did not require more than occasional pushing/pulling with the upper extremities, using hand controls, reaching overhead, climbing ramps or stairs, balancing, stooping, kneeling and crouching; and who could never climb ladders or scaffolds, crawl or work around hazards, such as unprotected heights and moving mechanical parts, could perform Moore's past relevant work. (R. at 222-23.) Next, Hensley testified the same hypothetical individual, but who could perform only sedentary work, could perform Moore's past relevant work. (R. at 223.) When asked to consider the same individual described in the first hypothetical, but who also could make only simple work-related decisions; respond appropriately to occasional changes in a routine work setting; and frequently interact with the public and co-workers, Hensley testified such an individual could not perform Moore's past work, but could perform other jobs existing in significant numbers in the national economy, including those of an office helper, a parking lot attendant and a nonpostal mail clerk. (R. at 223-24.) Finally, Hensley testified that the second hypothetical individual, which included the restriction to sedentary work, but who also had the mental health limitations outlined in hypothetical number three, could not perform Moore's past work, but could perform the jobs of an order clerk, a materials packer and sealer and an inspector/sorter/tester. (R. at 224-25.)

In rendering his decision, the ALJ reviewed records from Litton Family Medicine; Dr. William Platt, M.D.; Pennington Family Health Center; East Tennessee Brain and Spine Center, P.C.; Arthritis Associates of Kingsport, PLLC, ("Arthritis Associates"); Holston Valley Ambulatory Surgery Center; Regional Eye

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

Center; Appalachian Orthopaedic Associates; Holston Medical Group; Associated Orthopaedics of Kingsport; Wellmont Medical Associates; Jonesville Family Health; Ortho Tennessee; Sullivan & Bailey; University of Tennessee Medical Center, ("UT"); Stone Mountain Health Services; David Deaver, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Richard Luck, Ph.D. a state agency psychologist; and Dr. Eugene Noland, M.D., a state agency physician. Moore's counsel[5] submitted additional medical reports from Jonesville Family Health Center, Neurosurgical Associates, UT Rheumatology, UT and Ortho Tennessee to the Appeals Council.

An August 22, 2014, MRI of Moore's cervical spine showed posterior spurs at the C4-C5 through C6-C7 levels with severe degenerative disc disease, with only minimal cord compression at the C4-C5 level; left C4-C5 and left C5-C6 foraminal stenosis, moderate; and only minor stenosis elsewhere. (R. at 547-48.)

On January 21, 2015, Moore saw Dr. William Platt, M.D., with complaints of pain in the neck, left shoulder girdle and left glenohumeral area, as well as numbness in the left thumb and hand. (R. at 414.) An MRI of the shoulder showed suspected superior labral tear from anterior to posterior, ("SLAP"), lesion with extension into the biceps and some tendinosis of the supraspinatus. (R. at 414.) Dr. Platt also noted that an ultrasound of the shoulder had shown acromioclavicular, ("AC"), joint arthritis; an electromyogram, ("EMG"), had shown carpal tunnel syndrome, ("CTS"), with C6 radiculopathy; and he noted the cervical spine MRI findings. (R. at 414.) Dr. Platt diagnosed shoulder pain; AC arthrosis; CTS; ulnar neuropathy at

---

[5] Although Moore was unrepresented at the ALJ hearing, she, thereafter, secured legal representation.

the elbow; and de Quervain's disease.[6] (R. at 415.) He suggested an orthopaedic evaluation. (R. at 415.)

Also on January 21, 2015, Moore saw Ashlee Newland, P.A., a physician assistant at Arthritis Associates, reporting neck and shoulder pain and knee tenderness. (R. at 713.) Examination showed cervical paraspinous tenderness, hypertrophy of the proximal interphalangeal, ("PIP"), and distal interphalangeal, ("DIP") joints, bilateral shoulder and knee tenderness and some fullness of the knees. (R. at 714.) Newland diagnosed chronic osteoarthrosis involving multiple sites; chronic degenerative disc disease; and chronic neck pain, and she prescribed Lyrica. (R. at 714-15.)

On January 29, 2015, Moore saw Rita J. Brown, F.N.P., a family nurse practitioner at Jonesville Family Health Center, for complaints of depression, work stress and chronic joint pain, which made it difficult to work. (R. at 1326.) On examination, Moore was alert and oriented with a euthymic mood and appropriate affect; she had a normal gait; no lumbar tenderness; normal lumbar lordosis; normal lumbar range of motion; normal range of motion of the left arm; and pain in the AC joint on the left. (R. at 1328.) Brown diagnosed depressive disorder, not elsewhere classified; pain in an unspecified joint; and pain in the soft tissues of a limb. (R. at 1328-29.) She continued Moore on Cymbalta and prescribed Norco for arthralgias. (R. at 1329.)

---

[6] De Quervain's disease or de Quervain's tenosynovitis refers to a painful inflammation of tendons in the wrist and lower thumb. When the swollen tendons rub against the narrow tunnel they pass through, it causes pain at the base of the thumb and into the lower arm. *See* webmd.com/rheumatoid-arthritis/guide/de-quervains-disease#1 (last visited Feb. 20, 2020).

On February 10, 2015, Moore saw Dr. Bruce Miller, M.D., at Associated Orthopaedics of Kingsport, P.C., for an evaluation of left shoulder pain. (R. at 665.) Based on a November 2014 MRI, Dr. Miller diagnosed a labral tear, AC joint arthritis, projecting bone spurs and signs of supraspinatus tendinitis, but no rotator cuff tear. (R. at 665.) He recommended a diagnostic shoulder arthroscopy, arthroscopic labral repair versus debridement with likely a subacromial decompression and AC joint resection. (R. at 665.)

Moore saw Newland on March 16, 2015, reporting Lyrica provided significant pain relief, but her insurance would not pay for it. (R. at 931.) She further reported increased hand and knee pain with colder weather and since running out of Lyrica samples. (R. at 931.) Moore denied anxiety and depression. (R. at 932.) On examination, she had cervical paraspinous tenderness; hypertrophy of the PIP and DIP joints; tenderness of the metacarpophalangeal, ("MCP"), and PIP joints; left shoulder tenderness with decreased range of motion; bilateral knee tenderness and fullness; and left MCP tenderness. (R. at 932.) Newland diagnosed chronic osteoarthrosis involving multiple sites; chronic neck pain; and chronic degenerative disc disease, and she provided more Lyrica samples. (R. at 933.) She continued Moore on Zanaflex, Tramadol and Cymbalta. (R. at 933.)

Dr. Miller performed the left shoulder surgery on Moore on March 20, 2015, without complication. (R. at 677-78.) By April 1, 2015, Moore reported she was "already feeling much better." (R. at 664.) Examination of the left upper extremity looked good, including intact motor and sensory. (R. at 664.) Dr. Miller gave Moore a home exercise program with restrictions and precautions. (R. at 664.) On May 5, 2015, Moore reported being "thrilled with her results," noting her left shoulder was significantly improved. (R. at 663.) However, she reported having progressively

-9-

worsening right shoulder pain. (R. at 663.) Examination of the left shoulder showed an excellent range of motion with excellent rotator cuff strength. (R. at 663.) The right shoulder had limited range of motion with a positive impingement sign. (R. at 663.) Dr. Miller ordered an MRI of Moore's right shoulder, which was performed on May 14, 2015, and showed a large labral tear with a paralabral ganglion cyst. (R. at 662-63.) A surgical repair was scheduled. (R. at 662.)

Moore returned to Brown on May 21, 2015, with complaints of depression and pain. (R. at 881.) She reported having stopped work due to pain and stress, and she stated her current stressors were financial. (R. at 881.) Moore denied suicidal ideation, and she agreed to see a counselor. (R. at 881.) Physical examination was normal except for bilateral lumbar paraspinal muscle tension and mild right AC joint tenderness. (R. at 882.) Moore had proper orientation, a euthymic mood and an appropriate affect. (R. at 882.) Brown diagnosed depressive disorder, not elsewhere classified; and unspecified joint pain, and she continued Moore on Cymbalta and referred her for counseling. (R. at 882.) She also prescribed Norco for arthralgias. (R. at 882.)

On May 29, 2015, Dr. Miller performed surgery on Moore's right shoulder, again without complication. (R. at 675-76.) At a surgical follow up on June 9, 2015, Moore's right upper extremity nerves were intact to motor and sensory, and she had good range of motion of the elbow, wrist and hand. (R. at 661.) Dr. Miller instructed Moore on no excessive lifting, pushing or external rotation. (R. at 661.)

On June 4, 2015, Moore saw Brandon Bogle, Ph.D., a clinical psychologist, for counseling. (R. at 871.) She reported she had retired on March 31, 2015, from a stressful supervisory position. (R. at 871.) She reported sleep issues due to pain and

racing thoughts, and she reported recovering well from the two shoulder surgeries, despite having some residual pain. (R. at 871.) Moore stated she was caring for her 81-year-old mother and was up daily at "day break." (R. at 871.) Moore reported memory and concentration issues over the previous two years, which she attributed to stress and lack of sleep. (R. at 871.) She was fully oriented and denied any psychosis, suicidal or homicidal ideations, and dress and hygiene were appropriate. (R. at 871.) Bogle diagnosed adjustment disorder with mixed anxiety and depressed mood; and unspecified sleep disturbance. (R. at 872.)

Also, on June 4, 2015, Brown completed a "Physician's Report" in connection with Moore's retirement. (R. at 859-62.) Brown listed Moore's diagnoses as diffuse arthralgias from osteoarthritis and depression. (R. at 859.) She opined Moore became unable to work on March 31, 2015, noting that her condition had worsened over the previous year, and she considered Moore permanently disabled from performing her usual work duties. (R. at 859-60.)

Moore continued to see Newland throughout 2015. In June 2015, Moore reported her left shoulder was doing "great," but the right shoulder was "still very painful." (R. at 927.) In September 2015, she reported continued right shoulder pain. (R. at 922.) Moore reported diffuse myalgias and continued mild neck and knee pain. (R. at 922, 927.) However, she stated she felt "great with very little pain" with Lyrica, and she stated Zanaflex helped her neck. (R. at 922, 927.) Moore even noted she did not have to take Tramadol when she took Lyrica, but she ran out of Lyrica samples "sometime" ago. (R. at 927.) Moore denied anxiety and depression. (R. at 928.) In September 2015, Moore stated she had decided to forgo surgery on a cyst on her hand. (R. at 922.) Physical examinations showed cervical paraspinous tenderness; hypertrophy of the PIP and DIP joints; a cyst on the left second DIP

joint; right shoulder tenderness with decreased range of motion; and bilateral knee tenderness with some fullness. (R. at 923, 928-29.) Newland diagnosed osteoarthrosis involving multiple sites; neck pain; degenerative disc disease; and unspecified myalgia and myositis. (R. at 929.) Moore's medications were continued, and she received more Lyrica samples. (R. at 924, 929.)

When Moore saw Dr. Miller on July 21, 2015, she could comfortably forward flex to 90 degrees, abduct to 90 degrees, and she exhibited internal rotation to L5 and external rotation to -20 degrees. (R. at 833.) Dr. Miller referred Moore to physical therapy for right shoulder range of motion, and he released her from any restrictions or precautions. (R. at 833.) On September 15, 2015, Moore reported finishing physical therapy for the right shoulder, which was getting better, but remained stiff. (R. at 832.) She requested a steroid injection for osteoarthritis in her left knee, noting her last injection gave her good results for at least six months. (R. at 832.) Examination of the right shoulder was normal, including intact motor and sensory, excellent grip strength and good rotator cuff strength. (R. at 832.) Moore's left knee showed genu varum alignment, moderate joint effusion and tenderness to palpation over the medial compartment with palpable bone spurs, but good range of motion and no gross ligamentous instability. (R. at 832.) Dr. Miller administered an injection to Moore's left knee. (R. at 832.)

Moore continued to see Brown through 2015 for depression, panic attacks and joint pain. She reported, on three occasions, Cymbalta helped her pain and depression. (R. at 843, 850, 895.) Moore stated that her insurance company still had not approved Lyrica, (R. at 843, 850), and in October 2015, she requested to restart Neurontin. (R. at 843.) In October 2015, Moore reported anxiety and panic attacks, and in November 2015, she stated she was very anxious about several family issues

and her inability to work. (R. at 843, 895.) In October 2015, she requested to see a counselor, and Brown referred her to one. (R. at 843.) Despite Moore's mental health complaints, she was oriented with a euthymic mood and appropriate affect throughout this time. (R. at 844, 851, 896.) Physical examinations were unchanged, except Brown noted Heberden's and Bouchard's nodes[7] on both hands. (R. at 851, 896.) Moore was diagnosed with depressive disorder, not elsewhere classified; generalized anxiety disorder; adjustment disorder with anxiety; and unspecified joint pain, and Brown continued her on medications, including Cymbalta, BuSpar, Neurontin and Norco. (R. at 844, 896.)

David Deaver, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), of Moore on September 15, 2015, finding she was not restricted in her activities of daily living, had no difficulties maintaining social functioning or maintaining concentration, persistence or pace and had not experienced any repeated episodes of extended-duration decompensation. (R. at 234-35.) Deaver also noted the treatment notes indicated Moore had been properly oriented with an appropriate affect and no memory issues. (R. at 235.)

On September 21, 2015, Dr. Robert McGuffin, M.D., a state agency physician, completed a physical residual functional capacity assessment of Moore, finding she could perform light work, but was limited in her ability to push/pull with the upper extremities. (R. at 236-37.) Dr. McGuffin found Moore could perform all postural activities occasionally, and he imposed no manipulative, visual, communicative or environmental limitations. (R. at 237.)

---

[7] Heberden's nodes are bony swellings that form on the hands, generally on the finger joints nearest the fingertip, as a result of osteoarthritis. Bouchard's nodes are the same type of bony swellings, but are located on the lower, or PIP, joints of the fingers. *See* healthline.com/health/osteoarthritis/heberdens-nodes (last visited Feb. 20, 2020).

Moore saw Kim Schofield, a behavioral health intern at Pennington Family Health Center, on October 19, 2015, for intake. (R. at 841.) She reported sleep issues, feeling overwhelmed and experiencing panic attacks. (R. at 841.) Moore reported that her ex-husband, who lived with her, had a severe drinking problem, and she had been taking care of his medications for him, including setting them out, reminding him to take them and following up with his medical care. (R. at 841.) Moore also reported caring for her elderly mother, who had a variety of health problems, including rheumatoid arthritis. (R. at 841.) Moore stated this was stressful. (R. at 841.) Schofield diagnosed adjustment disorder with anxiety. (R. at 841.) Moore continued to see Schofield on a monthly basis through 2015. Later in October 2015, she reported physical pain was more of an issue than psychological distress, and she advised Schofield of an upcoming vacation. (R. at 901.) In November 2015, Moore noted how well she had been doing. (R. at 899.) She did report a panic attack, which was triggered by a dream, but stated it was the first one she had experienced in a long time. (R. at 899.) Moore expressed anxiety over giving her ex-husband an ultimatum to either stop drinking and help more around the house or find another place to live. (R. at 899.) Later that month, Moore reported continued anxiety over being in crowds, and she stated thinking about her former job caused worry, anxiety and panic. (R. at 1013.) By December 22, 2015, Moore advised Schofield her ex-husband was drinking less and showing her more respect, and her mother was being less hateful. (R. at 1021.) She reported feeling depressed and anxious when thinking about her former job, and she stated she had a tendency to isolate herself. (R. at 1021.) Moore advised Schofield that therapy was helpful. (R. at 1021.) Over this time, Schofield diagnosed Moore with adjustment disorder with mixed anxiety and depressed mood. (R. at 899, 1013, 1021.)

Moore saw Dr. Michael J. Sullivan, M.D., a gastroenterologist, on November 11, 2015, with complaints of gastroesophageal reflux disease, ("GERD"), and chronic constipation. (R. at 991.) At that time, she complained of arthritis, but denied joint pain and muscle weakness, as well as anxiety, depression, sleep difficulty and nervousness. (R. at 992.) Moore's neck had normal range of motion, she had a normal gait and station, she had no edema of either lower extremity, and she was oriented with normal judgment and insight. (R. at 992-93.)

On December 2, 2015, Moore reported increased pain, but felt it was due to inclement weather. (R. at 918.) She also reported continued arm stiffness. (R. at 918.) Otherwise, things were about the same. (R. at 918.) Moore reported exercising some. (R. at 918.) On physical examination, Dr. Christopher R. Morris, M.D. at Arthritis Associates, noted Moore had 11 out of 18 positive fibromyalgia tender points. (R. at 920.) She had osteoarthritic changes at the DIP joints, but no swelling or synovitis and a good range of motion; there was no swelling or tenderness of the wrists or elbows; the knees were cool with some crepitus, but no effusions; and the ankles and MTPs were "ok." (R. at 920.) Moore's cognition was normal, and she was oriented with appropriate mood and affect. (R. at 920.) She was diagnosed with fibromyalgia and primary generalized osteoarthritis. (R. at 920.) Dr. Morris noted the Lyrica had helped Moore the most, and they would continue working on getting insurance approval. (R. at 920.) She was advised to continue her other medications, and her Lyrica dosage was increased. (R. at 920.)

Richard Luck, Ph.D., a state agency psychologist, completed another PRTF on January 7, 2016. (R. at 247-48.) He concluded Moore had a nonsevere mental impairment. (R. at 248.) Specifically, Luck noted although Moore had some anxiety and depression due to changes in her situation caused by medical problems and

family issues, she was doing well in counseling and noted improvements in pain and mood with medications. (R. at 248.) Luck further noted Moore had good mental status examinations, and she was able to perform many daily tasks, including taking care of her ex-husband. (R. at 248.)

Also on January 7, 2016, Dr. Eugene Noland, M.D., a state agency physician, completed a physical assessment, finding Moore could perform light work with an occasional ability to push/pull with the upper extremities. (R. at 249-51.) Dr. Noland found Moore could occasionally climb ramps and stairs, balance, stoop, kneel and crouch, but never climb ladders, ropes or scaffolds or crawl. (R. at 250.) He further found Moore was limited to occasionally reaching overhead with both upper extremities. (R. at 250.) Dr. Noland limited Moore from even moderate exposure to hazards, such as machinery and heights, due to her osteoarthritis, degenerative disc disease and chronic pain in multiple joints. (R. at 251.)

On February 24, 2016, Moore reported to Sarah Janie Evans, N.P., a nurse practitioner at Jonesville Family Health Center, her medications controlled her chronic illness. (R. at 1023.) She reported some breakthrough anxiety over the previous few weeks, noting she was "really stressed" over the denial of her disability claim. (R. at 1023.) She stated her joint pain, which was exacerbated by activity, interfered with her activities of daily living. (R. at 1023.) Examination showed a normal gait and normal muscle tone, bulk and strength, but diminished sensation in both lower extremities. (R. at 1024.) Moore was alert with a euthymic mood and appropriate affect, and she had appropriate judgment and good insight. (R. at 1024.) Evans diagnosed unspecified joint pain and adjustment disorder with mixed anxiety and depressed mood, among other things. (R. at 1025.) She decreased Moore's Cymbalta dosage and prescribed BuSpar. (R. at 1026.) On March 16, 2016, Moore

reported BuSpar was helping her anxiety, and her current medications well-controlled her medical problems. (R. at 1027.) However, she noted she had been without Lyrica because her insurance company still would not pay for it. (R. at 1027.) On examination, her gait was slow and cautious, but motor examination was normal for muscle tone, bulk and strength. (R. at 1028.) Moore had a euthymic mood with appropriate affect, appropriate judgment and good insight, and her diagnoses remained the same. (R. at 1028-29.)

Moore advised Newland on April 4, 2016, that her insurance had approved Lyrica. (R. at 913.) She reported doing "fairly well," stating she had more pain in the hands and knees recently, but she was due for a knee injection. (R. at 913.) Moore reported an increased dosage of Lyrica helped with her fibromyalgia pain and myalgias, and she described her joint pain as tolerable. (R. at 915.) Moore was continuing to take Cymbalta and Zanaflex, as well as Tramadol, but only sparingly when needed for pain. (R. at 913.) On physical examination, Moore demonstrated cervical paraspinous tenderness; hypertrophy of the PIP and DIP joints; a cyst on the left second DIP joint; tender DIP and PIP joints bilaterally; knee tenderness bilaterally; tender fibrocystic points; and no synovitis. (R. at 915.) Newland diagnosed primary generalized osteoarthritis; and fibromyalgia, and she continued Moore on medications. (R. at 915.)

Moore continued to treat with Brown throughout 2016 for depression, anxiety and joint pain. (R. at 1034, 1062.) She stated she had only been taking BuSpar as needed. (R. at 1034.) Her stressors included family problems, her mother's declining health, including a cancer diagnosis, and an inability to work. (R. at 1034, 1062.) In July 2016, Moore reported Cymbalta helped with her pain and depression. (R. at 1034.) Physical examinations revealed a normal gait and a normal lumbar spine,

except for bilateral tension in the paraspinal lumbar muscles, and she had Heberden's and Bouchard's nodes on both hands. (R. at 1035, 1064.) She was oriented with a euthymic mood and appropriate affect. (R. at 1035, 1064.) Moore's diagnoses remained unchanged. (R. at 1036, 1064.) Brown continued Moore on Cymbalta and instructed her to begin taking the BuSpar twice daily. (R. at 1036, 1064.)

Moore presented to Ortho Tennessee on August 22, 2016, with complaints of chronic, moderate to severe left hip pain with popping and cracking, aggravated by walking and relieved by rest. (R. at 1043.) On physical examination, Moore had normal range of motion in both hips, normal strength in the lower extremities, no sacroiliac, ("SI"), joint pain or buttock pain, a normal gait, tenderness over both greater trochanters, a normal neurovascular examination of the lower extremities, normal strength in both lower extremities and full orientation. (R. at 1045.) Ben Wendel, P.A., a physician assistant, diagnosed hip pain, and he administered injections in both hips for bursitis. (R. at 1045-46.) She was continued on pain medications. (R. at 1046-47.) She continued to treat at Ortho Tennessee through November 2016. On September 19, 2016, she stated the injections did not help much at all, and she rated her then-current pain as an eight on a 10-point scale. (R. at 1053.) Moore reported she also was limping, and her pain was aggravated by daily activities. (R. at 1053.) A physical examination was normal, except for pain with internal rotation bilaterally; and tenderness over both greater trochanters. (R. at 1055.) Wendel diagnosed bilateral hip pain, and he ordered an MRI. (R. at 1055.) This MRI, performed on September 23, 2016, showed mild osteoarthritis in both hips; lumbar degenerative disc disease; and bilateral degenerated labra with bilateral anterior superior labral tears. (R. at 963-64.) On September 26, 2016, Moore continued to complain of bilateral hip pain, which she described as constant,

aggravated by standing and walking and relieved by rest. (R. at 1058.) Dr. Michael S. Eilerman, M.D., noted Moore walked with a mild limp, bilaterally, and her hip pain was consistent with trochanteric bursitis. (R. at 1059.) He further noted she had pain with internal and external rotation, bilaterally, but the lower extremities were neurovascularly intact. (R. at 1059.) Dr. Eilerman diagnosed degenerative joint disease and labral tearing of both hips, and bilateral, intraarticular cortisone injections were scheduled. (R. at 1060.) On November 21, 2016, Moore stated the injection helped the right hip, but helped the left hip for only a day. (R. at 1090.) Physical examination was the same, and Moore was oriented with normal memory. (R. at 1092.) She received another right hip injection, and Dr. Eilerman suspected her left hip pain was due to trochanteric bursitis. (R. at 1093.)

Moore began counseling with Ava Martin, P.M.H.N.P., a psychiatric mental health nurse practitioner at Jonesville Family Health Center, on November 16, 2016. (R. at 1072.) She reported family stressors, including caring for her ailing mother "24/7," depression and lack of energy. (R. at 1072.) She reported feeling "panicky" and like her "insides are going to jerk out at times," but she denied suicidal or homicidal ideation, as well as hallucinations. (R. at 1074.) Moore stated Cymbalta helped her pain. (R. at 1072.) Mental status examination showed Moore was clean, neat and well-groomed with a euthymic mood and congruent affect; appropriate eye contact; full orientation; intact thought process; no paranoia or delusions; good judgment and insight; calm and cooperative behavior; unremarkable motor movements; regular speech; good articulation; average intelligence; and no suicidal or homicidal thoughts. (R. at 1074-75.) Martin also noted Moore's recent and remote memory were intact. (R. at 1074.) She diagnosed Moore with generalized anxiety disorder; mild, recurrent major depressive disorder; and unspecified insomnia, and she initiated a trial of propranolol. (R. at 1074.) On November 16, 2016, Moore

reported continued depression and anxiety, as well as no energy and pain. (R. at 1201-02.) Nonetheless, she again stated Cymbalta helped her pain. (R. at 1202.) Moore's mental status examination continued to be normal, and Martin's diagnoses remained unchanged. (R. at 1205.) She continued Moore's medications. (R. at 1206.) On December 19, 2016, Moore stated she was aggravated. (R. at 1086.) Nonetheless, she reported the propranolol improved her panic symptoms, and she felt more leveled out and calm. (R. at 1088.) Moore stated cold, damp weather exacerbated her pain. (R. at 1088.) Martin added adjustment disorder with mixed anxiety and depressed mood to Moore's diagnoses, and she increased her medication dosages. (R. at 1088.)

When Moore returned to Dr. Sullivan on December 7, 2016, for gastrointestinal issues, she complained of arthritis, but denied joint pain or muscle weakness. (R. at 976.) She also complained of depression, but denied anxiety, difficulty sleeping or nervousness. (R. at 976.) Examination showed normal motion of the neck, normal gait and station, no edema of the lower extremities, full orientation and normal judgment and insight. (R. at 976-77.)

When Moore returned to Newland on January 10, 2017, she reported doing "fairly well," despite stating she had increased pain in her hands and knees, exacerbated by cold weather. (R. at 906.) She denied joint swelling. (R. at 906.) Moore reported stopping Lyrica after noticing increased bruising, but her pain increased. (R. at 906.) She requested a lower dose. (R. at 906.) On physical examination, Moore had cervical paraspinous tenderness; hypertrophy of the PIP and DIP joints; Heberden's nodes; tenderness of the DIP joints bilaterally; tender and full knees bilaterally; tender fibrocystic points; and no synovitis. (R. at 908.) Newland prescribed a lower dose of Lyrica, and she continued Moore on her other

medications, including Cymbalta, Zanaflex, Tramadol and Lortab. (R. at 908.) Bilateral hand x-rays, dated January 10, 2017, showed osteoarthritis of the DIP joints in both hands. (R. at 910.)

Moore continued treating with Brown throughout 2017 for depression, anxiety, mood swings and chronic pain. On February 14, 2017, her physical examination remained the same, except for limited range of motion of the lumbar spine was noted. (R. at 1112.) Moore was alert and oriented with a euthymic mood and appropriate affect. (R. at 1111-12.) Moore's diagnoses remained the same, and she was continued on medications. (R. at 1112.) On April 21, 2017, Moore stated she felt the Lyrica was causing her feet and legs to swell, as well as significant weight gain. (R. at 1119.) Physical examination remained unchanged, except bilateral varicosities and +1 to +2 lower extremity pedal edema was noted, left more than right. (R. at 1121.) Moore again was alert and oriented with a euthymic mood and appropriate affect, her diagnoses remained the same, and her medications were continued. (R. at 1121.) On July 20, 2017, Moore reported pain from varicose veins, but she had not been wearing her compression stockings due to the heat. (R. at 1145.) Her physical examination was the same, and Moore again was alert and oriented with a euthymic mood and appropriate affect. (R. at 1147-48.) Brown continued to diagnose adjustment disorder with mixed anxiety and depressed mood; and low back pain. (R. at 1148.) On October 23, 2017, Moore reported she was scheduled for an epidural in her back. (R. at 1255.) Her gait was normal, but she had bilateral lumbar paraspinal muscle tension, a limited range of motion of the lumbar spine, and she had 3+ edema in the left lower leg with generalized tenderness and erythema. (R. at 1258.) Moore was oriented with a euthymic mood and appropriate affect. (R. at 1258.) Among other things, she was diagnosed with low back pain; unspecified joint

pain; major depressive disorder, recurrent, mild; and left lower leg pain. (R. at 1258.)
Brown continued Moore on medications. (R. at 1258.)

On April 28, 2017, Moore returned to Ortho Tennessee with complaints of
left hip and left knee pain, as well as left knee stiffness and tenderness, aggravated
by walking. (R. at 1129.) Wendel diagnosed left hip trochanteric bursitis and left
medial knee pain, and Moore received injections in the left hip and knee. (R. at 1129-
30.) On July 17, 2017, she reported increasing pain in the left hip, not relieved by
the previous injection. (R. at 1142.) However, Moore reported the previous injection
helped her left knee. (R. at 1142.) Wendel noted lumbar spine x-rays showed
degenerative disc disease at the L4-L5 and L5-S1 levels with some scoliosis apex on
the left. (R. at 1142.) Left knee x-rays also showed moderate medial knee
osteoarthritis. (R. at 1142.) X-rays of the left hip and pelvis showed overall good
alignment of the joint with mild osteoarthritic narrowing, not severe. (R. at 1142.)
Physical examination was normal, except for some tenderness over the left greater
trochanter and the SI joint. (R. at 1143.) Moore was fully oriented. (R. at 1143.)
Wendel diagnosed left hip pain; left knee moderate medial compartment
osteoarthritis; and degenerative disc disease with left leg radiculopathy. (R. at 1143.)
Moore received another left knee injection, and Wendel recommended a lumbar
MRI. (R. at 1143.)

This MRI, dated July 24, 2017, showed multilevel degenerative changes. (R.
at 1172.) Effects upon the central canal were most apparent from the L2-L3 and L4-
L5 levels, where there was slight asymmetric crowding upon the descending left-
sided nerve roots in the left lateral recess. (R. at 1172.) Varying degrees of foraminal
stenosis were greatest on the left from the L2-L3 to L4-L5 levels and on the right at
the L5-S1 level. (R. at 1172.)

Moore returned to Dr. Eilerman at Ortho Tennessee on July 31, 2017, with complaints of pain extending down her left lower extremity and into her foot. (R. at 1158.) She reported mild symptoms down the right lower extremity. (R. at 1158.) Dr. Eilerman noted the MRI results, and he found her symptoms were consistent with sciatica. (R. at 1158.) Moore exhibited positive straight leg raise testing, and she walked with a mild left lower extremity limp. (R. at 1158.) Dr. Eilerman diagnosed Moore with lumbar back pain with radiculopathy affecting the left lower extremity, and he referred her to Dr. Kent Sauter, M.D., a neurosurgeon at UT. (R. at 1158.)

Moore was seen at The Vein Care Center on October 11, 2017, for painful varicose veins and left leg pain. (R. at 1260.) She reported long periods of standing or sitting increased her symptoms, while elevation of the legs improved them. (R. at 1260.) Moore stated her symptoms were interfering with her ability to perform normal daily activities. (R. at 1260.) She reported having tried exercise and weight loss without improvement in symptoms. (R. at 1260.) Examination showed normal peripheral pulses in the extremities with no pedal edema, clubbing or cyanosis. (R. at 1262.) Varicose veins were noted on the lateral portion of both legs and the right anterior lower leg, and venous stasis dermatitis and lipodermatosclerosis was noted in the left leg. (R. at 1262.) Elizabeth Reed, P.A., a physician assistant, diagnosed varicose veins with changes in the skin and subcutaneous tissue, and she ordered a venous duplex ultrasound. (R. at 1262.)

On August 18, 2017, Moore saw Dr. Kent Sauter, M.D., a neurosurgeon with Neurosurgical Associates, P.C., for complaints of severe low back pain, left leg pain with leg numbness and mild right leg pain. (R. at 181.) She reported having hip injections, which were not helpful, but she had not undergone epidural steroid

injections, physical therapy or back surgery. (R. at 181.) On examination, Moore had a normal gait and full and symmetric strength in the lower extremities, but diminished sensation in the left L3-L5 distribution and positive straight leg raising tests, left greater than right. (R. at 181.) She was fully oriented with appropriate attention span, language skills, fund of knowledge, and cognition, normal immediate and remote memory, and her affect, mood, behavior and attitude were unremarkable. (R. at 181.) Dr. Sauter noted the July 2017 MRI results, and he diagnosed spondylosis without myelopathy or radiculopathy, lumbar region. (R. at 181-82.) He elected to try physical therapy and epidural steroid injections to see if that would help Moore. (R. at 181.) If she was not improved in six weeks, he would consider her for surgical intervention. (R. at 181.)

Moore saw Brown on December 29, 2017, with complaints of continued joint pain, worse in the hands and knees, and she requested a reevaluation by a rheumatologist in Knoxville. (R. at 96.) She had a normal gait, she was alert and oriented, she had a euthymic mood with appropriate affect, and an antinuclear antibody test was negative. (R. at 99, 102.)

On February 25, 2018, Moore saw Dr. Naveen T. Raj, D.O., a rheumatologist at UT Medical Center and Physician Offices, for evaluation of generalized joint pain, mostly in both hands. (R. at 189.) Moore described this pain as constant and worsened with activity and cold weather. (R. at 189.) She also reported chronic low back pain, as well as joint stiffness, but she denied joint swelling. (R. at 189.) Moore stated Cymbalta helped her pain, but Lyrica and gabapentin did not. (R. at 189.) Physical examination revealed no clubbing, cyanosis, ischemia or peripheral edema of the extremities, and she was alert and fully oriented with a normal gait, normal reflexes and a full range of motion in all joints. (R. at 190.) Moore was tender to

palpation in both shoulders, both elbows, both hands and both ankles, but had no swelling. (R. at 190.) X-rays of both of Moore's hands, dated February 19, 2018, showed symmetric bilateral moderate osteoarthritis involving mainly the second through fifth digital PIP joints. (R. at 192-93.) Dr. Raj concluded that Moore's history and physical did not strongly suggest an autoimmune inflammatory arthropathy or connective tissue disorder, and he suspected her joint pains were secondary to osteoarthritis. (R. at 190.) He noted features of fibromyalgia, including soft tissue tender points and chronic fatigue. (R. at 190.) Dr. Raj instructed Moore to practice good sleep habits, healthy eating and regular exercise. (R. at 190.)

An MRI of Moore's lumbar spine, dated February 28, 2018, showed multilevel degenerative disc disease with disc bulge, grade 1 retrolisthesis of L2 on L3, and mild dextroconvex curvature of the lumbar spine; associated moderate to severe multilevel neural foraminal stenosis involving the left L2-L3, left L3-L4, left L4-L5 and right L5-S1 levels. (R. at 76.) It was noted that these results were not significantly changed from imaging in 2017. (R. at 76.)

Moore returned to Dr. Sauter on April 20, 2018, with continued complaints of back and leg pain, left worse than right. (R. at 80.) He noted the recent lumbar MRI findings, and he diagnosed lumbar spondylosis with radiculopathy; lumbar foraminal stenosis; and scoliosis, and he planned to perform an L3-L4 and L4-L5 left-sided laminar foraminotomy and possible disckectomy. (R. at 80.)

On April 21, 2018, Moore was hospitalized at UT after falling down some stairs and fracturing the right third through ninth ribs, the inferior body T8, the right T7 through ninth transverse process and the right L1 to L3 transverse process. (R. at 109-10, 119, 139.) Orthopaedics recommended conservative nonoperative

management with a thoracic lumbar sacral orthosis, ("TLSO"), brace. (R. at 110, 130.) Moore was discharged on April 24, 2018, with instructions to wear the brace at all times when out of bed. (R. at 130.) Walking was encouraged, but she was restricted from heavy lifting and reaching/lifting items above head. (R. at 131.)

Moore saw Dr. Christine Seaworth, M.D., at Ortho Tennessee on May 7, 2018, for a follow up of her fractures. (R. at 159.) She had been wearing her TLSO brace, which she said helped, and she stated she was slowly improving. (R. at 159.) Moore complained of intermittent, moderate lumbar spine pain. (R. at 159.) On examination, Moore's lower right extremity strength was normal, as was her gait, lower extremity muscle tone, paraspinal muscle tone, motion/stability, reflexes, sensation and pulses in the lower extremities. (R. at 161.) She exhibited thoracolumbar tenderness, and she had decreased passive range of motion. (R. at 161.) She was fully oriented. (R. at 161.) Dr. Seaworth noted Moore's fractures showed "routine healing," and she instructed Moore to continue wearing the brace. (R. at 162.)

When Moore returned to Dr. Sauter on June 8, 2018, he noted the previous plan to perform the L3-L4 and L4-L5 right-sided laminoforaminotomy and possible disckectomy for left-sided L3-L4 and L4-L5 foraminal stenosis. (R. at 78.) However, before Moore could undergo this surgery, she fell off a four-foot deck and suffered multiple fractures, including of her spine. (R. at 78.) Physical examination was normal, including appropriate orientation, attention span, language skills, fund of knowledge and cognition, as well as unremarkable affect, mood, behavior and attitude and normal immediate and remote memory. (R. at 78.) Dr. Sauter deferred treatment for Moore's spinal fractures to the orthopaedic surgeon at UT, noting he would see her again once she was out of the brace, at which time the possibility of

surgical intervention for her conditions prior to the fall would be revisited. (R. at 78.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & Supp. 2019); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This

court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Moore argues that the ALJ's decision is not based on substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 13-22.) Specifically, she argues that the evidence submitted to the Appeals Council is new, material and relates to the period on or before the ALJ's decision and that it undermines the ALJ's finding of nondisability, thereby warranting a remand of her claim. (Plaintiff's Brief at 15-20.) Moore also argues the ALJ erred by failing to find she suffered from a severe mental impairment. (Plaintiff's Brief at 20-22.)

Moore argues the evidence she submitted to the Appeals Council was "new" and "material" and warrants a remand for further evaluation. I am not persuaded by this argument. The Appeals Council must consider evidence submitted to it when it is deciding whether to grant review, "'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" *Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)). Evidence is "new" if it is "not duplicative or cumulative." *Wilkins*, 953 F.2d at 96 (citation omitted). Evidence is "material" if there is a "reasonable possibility that the new evidence would have changed the outcome." *Wilkins*, 953 F.2d at 96 (citing *Borders*

*v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985)). In addition to showing the evidence is both new and material, the claimant seeking a remand must show good cause[8] for her failure to submit the evidence when the claim was before the Commissioner. *See Owens v. Astrue*, 2010 WL 3743647, at *4 (W.D. Va. Sept. 22, 2010) (citing *Borders*, 777 F.2d at 955). The Appeals Council rejected certain of the additional records because they were dated after the date of the ALJ's opinion, and, according to the Appeals Council, did "not relate to the period at issue … [and did] not affect the decision about whether [she was] disabled beginning on or before March 30, 2018." (R. at 2.) The Appeals Council found that the remaining records did not "show a reasonable probability that it would change the outcome of the decision." (R. at 2.) The Appeals Council instructed Moore if she wished it to consider whether she was disabled after March 30, 2018, she could file a new claim. (R. at 2.)

Any evidence that was not submitted to the Appeals Council, or that the Appeals Council chose not to incorporate into the record, is reviewed under sentence six of 42 U.S.C. § 405(g). Sentence six allows a court to remand for the consideration of additional evidence if it is new and material, good cause exists for its late submission, and the claimant must "present to the remanding court at least a general showing of the nature of the new evidence." *Owens*, 2010 WL 3743647, at *4 (citing *Borders*, 777 F.2d at 955). A court's authority under sentence six is limited to remanding the case for "additional evidence to be taken," *Wooding v. Comm'r of Soc. Sec.*, 2010 WL 4261268, at *2 (W.D. Va. Oct. 29, 2010), and it may not "rul[e] as to the correctness of the administrative determination." *Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citation omitted).

---

[8] Examples of good cause include being misled by the Appeals Council, having a physical, mental, educational or linguistic limitation that prevents the claimant from informing the Appeals Council about the evidence or submitting it earlier or some other unusual, unexpected or unavoidable circumstance beyond a claimant's control. *See* 20 C.F.R. § 404.970(b) (2019).

Here, I find this case should be analyzed under sentence six because the Appeals Council did not incorporate any of the additional evidence into the record. (R. at 5-6.) That being the case, the court need not consider any of the evidence substantively, on appeal. *See Wilkins*, 953 F.2d at 96. This further means that Moore must show good cause for failing to submit this evidence earlier. I find that Moore has failed to make the requisite good cause showing. *See Owens,* 2010 WL 3743647, at *4 (citing *Borders,* 777 F.2d at 955.)

The only evidence submitted to the Appeals Council, which existed at the time of the ALJ's October 27, 2017, hearing, but was not provided to the ALJ, was the August 18, 2017, report from Dr. Sauter. However, Moore had offered no explanation as to why this record was not submitted, or why she did not make the ALJ aware of its existence, instead choosing to submit it to the Appeals Council for the first time. That being the case, I find Moore has not shown good cause for her failure to inform the ALJ of the existence of this evidence or submit it when the claim was before the Commissioner, thereby failing to meet her burden for remanding the case to the ALJ for further evaluation. Thus, the court finds it unnecessary to decide whether this evidence meets the "new" and "material" requirements.

Some of the evidence submitted to the Appeals Council clearly post-dates the time period that is relevant to Moore's claim, as stated in the Appeals Council's decision. This includes the April 20 and June 8, 2018, treatment records from Dr. Sauter, the treatment records from UT related to Moore's fall-related fractures and a May 7, 2018, treatment note from Dr. Seaworth. I find that none of these notes, except, possibly, Dr. Sauter's, are probative of Moore's condition during the relevant time period. With regard to Dr. Sauter's notes, the court wishes to address his

suggestion, in April 2018, that Moore undergo surgical intervention for her lumbar spine issues. Even assuming these notes are "new," I find that they are not material, in that there is not a reasonable probability they would have changed the ALJ's decision. Specifically, the February 2018 MRI findings, upon which Dr. Sauter based his surgical recommendation, explicitly state they are not significantly changed from imaging in 2017, which the ALJ had before him when he made his decision. Furthermore, the ALJ accounted for limitations resulting from Moore's lumbar impairment by restricting her to the performance of sedentary work that required no more than occasional postural activities, except no crawling, climbing of ladders, ropes or scaffolds or work at unprotected heights or around moving machinery. Moreover, as the Commissioner states in his brief, the ALJ did not make his findings based on the lack of a recommendation for surgical intervention. Therefore, I find that the notes that post-date the ALJ's decision either are not probative of Moore's condition during the relevant time period or they would not make it reasonably probable the ALJ would have reached a different decision had they been before him.

That leaves the court with three records to consider, namely the February 19, 2018, x-rays of Moore's hands, the February 25, 2018, treatment note from UT Rheumatology and the February 28, 2018, lumbar MRI. These records were created after the ALJ's hearing, but before the ALJ rendered his decision. As stated above, Moore must show good cause for her failure to submit these records to the ALJ. Moore has offered no explanation, let alone shown good cause, for this failure. That being the case, the undersigned need not consider these treatment records any further on appeal.

Additionally, Moore at least implies that the Appeals Council failed to give the additional evidence she submitted due consideration. I am not persuaded. The regulations do not require the Appeals Council to provide a rationale in denying review. *See Meyer v. Astrue*, 662 F.3d 700, 705-06 (4th Cir. 2011). Nonetheless, here, the Appeals Council specifically stated in its denial that some of the newly submitted evidence did not relate to the appropriate time period. It further stated that the remaining additional evidence did not provide a basis for changing the ALJ's decision and advised Moore she could file a new application if she wished for the Agency to consider the issue of disability after March 30, 2018. *See Meyer,* 662 F.3d at 706 (citing *Martinez v. Barnhart,* 444 F.3d 1201, 1207-08 (10th Cir. 2006) (finding "nothing in the statutes or regulations" requires the Appeals Council to articulate its reasoning when "new evidence is submitted and the Appeals Council denies review."). Therefore, I find any such argument to the contrary is without merit.

Finally, Moore also argues that the ALJ failed to obtain and review the evidence dated prior to the October 26, 2017, hearing and March 30, 2018, decision, and that this failure was exacerbated by her status as an unrepresented claimant. I disagree with Moore. First, the ALJ took special care at the hearing to discuss with Moore the existence of any outstanding evidence. Moore advised the ALJ that she had requested records regarding mental health treatment with Ava Martin, but these had not been received. Therefore, the ALJ advised Moore he would request those records and hold the record open until they were received before making a decision in her case. The ALJ explicitly asked Moore whether there was any other evidence related to her disability that she had not gotten to him. She advised him of some upcoming procedures on her back, and possibly her leg, but she knew of nothing else. (R. at 227.) While the ALJ has a duty to develop the record, *see Sims v. Apfel*, 530 U.S. 103 (2000); *see also Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986),

which is heightened in situations like here where the claimant is unrepresented, *see Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999), I find that the ALJ met his duty in this regard. As stated above, the ALJ explicitly questioned Moore at the hearing regarding any outstanding evidence, and he advised Moore he would obtain the treatment notes from Ava Martin that Moore had not been able to secure. While Moore stated she had some upcoming procedures, she did not advise the ALJ of who the providers would be or that she might have difficulty obtaining these records. Moore knew the ALJ was holding the record open until he was able to acquire Martin's treatment notes, and Moore could have advised the ALJ, after the hearing, if she was having difficulty obtaining any of these additional treatment notes. She did not. It is the claimant's responsibility to provide the ALJ with all the medical records to show her disability. *See* 20 C.F.R. § 404.970(b)(3)(iv) (requiring claimant to advise of the existence of or submit all evidence relating to disability); *see also* 20 C.F.R. § 404.1512 (2019) (providing it is the claimant's responsibility to submit all known evidence relevant to the issue of disability).

For all these reasons, I find the additional evidence submitted to the Appeals Council either is not relevant to the time period at issue or Moore failed to show good cause for failing to submit it to the ALJ. Therefore, it cannot serve as a basis to remand her claim.

Moore also argues the ALJ failed to properly consider her mental impairments and their resulting effects on her ability to perform her skilled, past relevant work. Moore argues the ALJ erred by failing to find she had a severe mental impairment. I disagree. An impairment is not severe if it does not significantly limit the ability to perform basic work activities. *See* 20 C.F.R. § 404.1520(c) (2019). The severity of a mental impairment is assessed by utilizing the special technique set forth in 20

C.F.R. § 404.1520a, which requires the ALJ to assess a claimant's functional limitations in the four broad areas of (1) understanding, remembering or applying information; (2) interacting with others; (3) concentrating, persisting or maintaining pace; and (4) adapting or managing oneself. *See* 20 C.F.R. § 404.1520a(c)(3) (2019). Each of these areas is assessed as none, mild, moderate, marked or extreme. *See* 20 C.F.R. § 404.1520a(c)(4). If the ALJ assesses a claimant's functional limitations in these areas as none or mild, the claimant's impairment generally will be found to be nonsevere. *See* 20 C.F.R. § 404.1520a(d)(1). Here, the ALJ found Moore's limitations in each of these four areas to be no more than mild, and he, therefore, determined Moore's mental impairments were nonsevere. I find such a decision is supported by substantial evidence.

In his decision, the ALJ found Moore had no limitation in the area of understanding, remembering or applying information. (R. at 14.) The ALJ correctly noted the record showed no serious deficits in long-term or short-term memory, insight or judgment; Moore was able to give treating and examining practitioners good medical and mental health history; and she performed normal and necessary household activities like laundry, grocery shopping, running errands and general housework, which require a basic level of understanding, remembering and applying information. In addition to the ALJ's findings, I note that Moore reported caring for her ailing elderly mother, as well as her ex-husband, for whom she set out medications, reminded him to take them and managed his medical care.

Next, regarding the area of interacting with others, the ALJ found Moore was only mildly limited. (R. at 14.) The ALJ correctly noted Moore generally interacted normally with her treating practitioners, she consistently had an appropriate affect and a euthymic mood, she went out in public to shop and reported no problems in

this regard, and she did not complain to treating providers of problems with interpersonal interaction.

The ALJ next found Moore had no limitation in the area of concentrating, persisting or maintaining pace. (R. at 14.) Specifically, he correctly noted Moore did not complain of any serious difficulty in this area to her treating practitioners. Although she reported memory and concentration issues on one occasion, she stated this was due to stress and sleep difficulty. The ALJ also correctly noted that Moore was consistently oriented.

Lastly, the ALJ found Moore was mildly limited in the area of adapting or managing oneself. (R. at 14.) The ALJ correctly stated Moore was able to independently perform activities of daily living, including grocery shopping, running errands and performing general housekeeping.

In addition to these specific findings with regard to each broad functional area, the ALJ noted Moore's repeated reports that medication helped control her depression, she repeatedly denied suicidal thoughts, and, despite complaints of depression and anxiety, her mental status examinations revealed she was fully oriented with a euthymic mood and appropriate affect. Moore's stress and anxiety were situational, including her mother's failing health, her ex-husband's severe drinking problem and her perception that she could not work. The ALJ further noted that Moore's mental health impairments had not prevented her from performing her skilled work, and she retired from her job in March 2015 when she underwent shoulder surgery. Lastly, the ALJ correctly stated Moore continued to receive the same routine treatment she had received for years.

In addition to Moore's statements that Cymbalta helped her depression, she also stated BuSpar helped her anxiety, and propranolol improved her panic symptoms and made her feel calm and level headed. She also reported that counseling helped her. In July 2016, she reported anxiety, but admitted she was taking BuSpar only "as needed," instead of as prescribed. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Moreover, Moore advised Schofield, in October 2015, her physical pain was more of an issue than psychological distress. In November 2015, she reported having a panic attack, but she stated that was the first one she had experienced in a long time. When she reported "breakthrough" anxiety in February 2016, it was regarding the denial of her disability claim. In December 2016, Moore denied anxiety or nervousness. Lastly, in September 2015, and again in January 2016, the state agency psychologists opined Moore did not have a severe mental impairment. Based on all the above, I find that substantial evidence exists in the record to support the ALJ's finding that Moore did not have a severe mental impairment.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's finding that Moore did not suffer from a severe mental impairment;

2. The additional evidence submitted to the Appeals Council cannot serve as a basis to remand Moore's claim to an ALJ for further consideration; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Moore was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Moore's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2018):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      February 21, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE